

Nick Mirr
Federal Defenders of Eastern Washington and Idaho
306 E. Chestnut Ave.
Yakima, Washington 98901
509.248.8920
Attorney for Daniel James Anderson

## United States District Court
### Eastern District of Washington
Honorable Mary K. Dimke

| | |
|---|---|
| United States,<br><br>Plaintiff,<br><br>v.<br><br>Daniel James Anderson,<br><br>Defendant. | No. 4:22-CR-6001-MKD-1<br><br>Memorandum in Support of Sentencing<br><br>August 17, 2023 – 1:30 p.m.<br>Richland—With Argument |

## I.    Introduction

Daniel James Anderson respectfully submits this memorandum in aid of his sentencing, which is scheduled for August 17, 2023, in Richland. Mr. Anderson comes before the Court after pleading guilty to one count of conspiracy to make or possess an unregistered destructive device. Mr. Anderson, at the time of his sentencing, will have been in the community on stringent conditions of pretrial release for just over 18 months.[1] In those 18 months, Mr. Anderson has maintained perfect compliance with his release conditions, secured steady employment, engaged in mental health treatment services, and resumed being a loving and supportive father and husband. In light of Mr. Anderson's demonstrated commitment and ability to be successful in the community, defense counsel respectfully submits that sending him into the custody of the Bureau of Prisons to serve any additional time in custody would work a harsher punishment than necessary after a consideration of the § 3553(a) factors and is not appropriate. Accordingly, Mr. Anderson respectfully requests the Court recognize the sincere and profound remorse and change Mr. Anderson has lived over the past 18 months and sentence him to a term of five (5) years' probation and the $100 special penalty assessment.

---

[1] *See* ECF No. 57 (Order Granting Defendant's Motion to Reopen Detention Hearing and Setting Conditions of Release). Mr. Anderson was release on February 15, 2022. *Id.*

## II.    Discussion

### A.    Base Offense Level and Enhancements

As discussed in Mr. Anderson's separately filed PSR Objections,[2] Mr. Anderson objects to the application of a four-level enhancement under USSG § 2K2.1(b)(6)(B). He had a few other minor corrections, which USPO Kennicutt indicated could be resolved without formal objection. Accordingly, Mr. Anderson objects to the Total Offense Level calculation of 21 and the concomitant guideline range of 37-46 months in the draft PSR. He does not object to the criminal history calculation. Properly calculated, and without the four-level enhancement, Mr. Anderson believes the correct Total Offense Level is 17, his criminal history category is I, and that the correct guideline range is 24-30 months.

### B.    Departures

Mr. Anderson does not seek any departures.

### C.    18 U.S.C. § 3553(a)

In imposing a sentence, the Court is required to undertake an individualized assessment of Mr. Anderson and to "impose a sentence sufficient, *but not greater than necessary*"[3] to accomplish the goals laid out in 18 U.S.C. § 3553. As the Supreme Court observed, "[i]t has been uniform and constant in the federal judicial tradition for the

---

[2] ECF No. 109 (PSR Objections).
[3] 18 U.S.C. § 3553(a) (emphasis added).

Sentencing Memorandum
– 2 –

1    sentencing judge to consider every convicted person as an *individual* and every case as

2    a unique study in the human failings that sometimes mitigate, sometimes magnify, the

3    crime and the punishment."[4] Here, Mr. Anderson made a series of bad decisions, born

4    out of isolation and fear, that led to him ultimately constructing a singular destructive

5    device. That said, despite the fears of agents involved in this case, Mr. Anderson never

6    acted with violence towards any law enforcement, never tested let alone used a

7    destructive device against anyone, and has demonstrated that he is no risk to the

8    community while on pretrial release for the past 18 months. Mr. Anderson respectfully

9    submits, then, that after consideration of the § 3553(a) factors, a sentence of five (5)

10    years' probation is sufficient but not greater than necessary. The reasons why are

11    explained below.

12        *Mr. Anderson's history and characteristics*

13        Mr. Anderson was born in Denver, Colorado and will be just 28 years old at the

14    time of his sentencing.[5] Mr. Anderson was removed from his birth home along with his

15    biological sister, Jennifer, at an early age due to neglect, abuse, and likely substance use

16    by his biological mother.[6] Luckily, Mr. Anderson and his biological sister were adopted

17

18

19

---

[4] *Gall v. United States*, 552 U.S. 38, 52 (emphasis added)(quoting *Koon v. United States*, 518 U.S. 81, 98 (1996)).
[5] ECF No. 108 at ¶61.
[6] *Id.*

Sentencing Memorandum
– 3 –

a short time afterwards by Brian and Kimberly Anderson.[7] There, Mr. Anderson and his sister were able to start a new life with their adopted parents and their two new siblings.[8] Although Mr. Anderson's parents were a new and stable support system for him and his biological sister, difficulties followed them from their birth-mother's home.

Both Mr. Anderson and his sister Jennifer suffer from permanent medical issues due to their birth mother consuming alcohol while she was pregnant.[9] Mr. Anderson, though he does have a diagnosis of alcohol related neurodevelopmental disorder, was more fortunate than his sister who was diagnosed with Fetal Alcohol Syndrome.[10] She was also diagnosed with schizophrenia and reactive attachment disorder—both related to her biological mother's abuse of alcohol.[11] Unfortunately, these diagnoses led to significant difficulties and instability in Mr. Anderson's home while growing up. Mr. Anderson noted that his sister acted out regularly and described her actions during his childhood as "traumatic."[12]

Mr. Anderson himself struggled while he was growing up. He experienced developmental delays and when he was nine (9) years old, he developed Tourette's

---

[7] *Id.*
[8] *Id.*
[9] *Id.* at ¶ 65.
[10] *Id.*
[11] *Id.*
[12] *Id.* at ¶ 66.

Syndrome and narcolepsy.[13] As a result of these diagnoses, doctors ultimately discovered that Mr. Anderson had a lesion on his brain.[14] Fortunately, this lesion—and the Tourette's and narcolepsy along with it—self-resolved when Mr. Anderson was still young.[15] Less fortunately, Mr. Anderson missed significant amounts of school due to these conditions and suffered from serious bullying. He started receiving mental health treatment when he was a child.[16]

Ultimately, however, Mr. Anderson was able to rejoin schooling normally. He graduated from New Horizons High School in Pasco.[17] Mr. Anderson then attended some post-secondary schooling and, through Washington State University, received certification to be a peer counselor.[18] Mr. Anderson's participation in the peer counseling program resulted from the mental health treatment he had started as a child.[19] Mr. Anderson had been a childhood participant of the Three Rivers Wrap Around program, and as an adult, leaped at the opportunity to work as a peer counselor

---

[13] *Id.* at ¶ 67.
[14] *Id.*
[15] *Id.*
[16] *Id.* ¶
[17] *Id.* at ¶ 76.
[18] *Id.*
[19] *Id.* at ¶ 80.

1   himself.[20] Indeed, Mr. Anderson was employed as a peer counselor for about a year,

2   but ultimately left the program after one of his clients passed away.[21]

3        It was around this time that Mr. Anderson met his wife and the two ultimately

4   married in March of 2015.[22] He and his wife Amanda had their first child, a daughter,

5   shortly after and welcomed their first son a few years later.[23] Mr. Anderson has acted

6   as the primary caregiver to both of his children for the majority of their lives. Up until

7   the events leading to Mr. Anderson's arrest, he largely lived a quiet life of a stay-at-

8   home parent—a life he has largely returned to while on pretrial release.

9        *The nature and circumstances of the offense*

10       Sometime around the beginning of 2021, law enforcement became aware of Mr.

11  Anderson's involvement in the group that sometimes referred to itself as the "Verified

12  Bois."[24] Mr. Anderson had initially met the other group members in a chatroom prior

13  to 2021 and described the initial purpose of the group as more generally firearm and

14  survivalist oriented.[25] Mr. Anderson remained engaged in the group for the next

15  approximately two (2) years, including during the Covid-19 pandemic. Sometime

16  around the end of 2020, however, the group began to take a noticeable turn towards

17  _____

18  [20] *Id.*
    [21] *Id.*
    [22] *Id.* at ¶ 69.

19  [23] *Id.*
    [24] *Id.* at ¶ 14-15.
    [25] Exhibit 1 (Dr. O'Donnell's Report) at 11.

Sentencing Memorandum
– 6 –

more "militia"-type discussions.[26] It had always had a libertarian bent, but something was different. Mr. Anderson, who has struggled with social acceptance since he was a child and dealing with Tourette's and narcolepsy, felt welcomed and supported by the group and went along with these discussions. Beyond, merely going along, however, Mr. Anderson does not dispute that he participated in trainings with firearms, that he made statements about building destructive devices, and that he actually constructed the destructive device seized in this case. The building of this singular device was a serious and substantial mistake on Mr. Anderson's part. However, despite the government's arguments, they omit significant context.

This Court, and society at large, is aware of the isolating and significant impact the Covid-19 pandemic had on this country. Mr. Anderson, who has struggled with his mental health and self-esteem his entire life, was particularly vulnerable to the isolating impacts of the pandemic. Fearing the loss of respect or support from his fellow group members, Mr. Anderson acted against his better judgment and built the destructive device. He engaged in conversations with the CI and others about how the device could be used against law enforcement. Importantly, however, there is absolutely no evidence to suggest that this device was ever tested, ever brought to a training, or ever part of a specific plan of attack.

---

[26] *Id.*

Indeed, although the CI provided much information to law enforcement about how serious Mr. Anderson was, the search of his home by law enforcement recovered very little. Importantly, no firearms were recovered. No body armor was found. No ballistic shield was located. No claymores were spotted or removed. No plans to bomb buildings, infrastructure, or specific law enforcement targets were identified. Instead, Mr. Anderson was arrested shortly after dropping his daughter off at the bus stop. He was babysitting his youngest son and a neighbor. And he put up exactly no resistance.

Although Mr. Anderson may have presented a tough and imposing figure online—and he certainly exhibited poor decision-making and used concerning language to discuss law enforcement—the gulf between Mr. Anderson's skills and what he actually did when arrested paint a very different picture than that advanced by the government. For these reasons, the nature and circumstances of the offense support a probationary sentence.

*The need for deterrence, to reflect the seriousness of the offense, and avoid disparities*

A five-year probation sentence will send an exceptionally strong message of deterrence to Mr. Anderson, while simultaneously factoring in the post-offense rehabilitation he has demonstrated. Importantly, Mr. Anderson comes before the Court having never been convicted of any other offenses. And while there is no dispute that this is a serious offense, should Mr. Anderson be sentenced to a term of probation and subsequently violate any of the conditions of his probation, this Court will retain

jurisdiction to sentence Mr. Anderson to up to five years in prison.[27] The fact a plenary resentencing remains open for this court for the entirety of Mr. Anderson's probation term works a significant deterrent effect as Mr. Anderson is keenly aware of this possibility.[28] It also appropriately reflects the seriousness of the offense because of the significant length of the probation term.

The reasonableness of the 60-month probation recommendation is further strengthened by a review of data contained in the Judiciary Sentencing Information (JSIN) platform. JSIN is a tool designed by the United States Sentencing Commission to provide "quick and easy access to sentencing data for similarly situated defendants."[29] After inputting the correct Guideline chapter (§ 2K2.1), Mr. Anderson's final offense level (17), and his criminal history category of I, the JSIN data notes individuals who received prison time and did not receive a § 5K1.1 departure received an average sentence of 21 months—**a full 16% of individuals received no custodial sentence.** Even under the Government suggested final offense level of 21, excluding § 5K1.1 departures, the average sentence was 31 months and **12% of individuals received no custodial sentence**. This data helps to show that a significant

---

[27] 18 U.S.C. § 3561(a), (c)(1) (noting that Mr. Anderson, having been convicted of a Class D felony, is eligible for a term of probation between one (1) and five (5) years).

[28] 18 U.S.C. § 3565(a)(2) (noting that should Mr. Anderson's term of probation be revoked, the Court may "resentence the defendant under subchapter A).

[29] *Judiciary Sentencing Information*, USSG, https://www.ussc.gov/guidelines/judiciary-sentencing-information (last visited Aug. 2, 2023).

1 number of individuals charged with similar offenses receive non-custodial sentences.

2 Mr. Anderson is not asking for a sentence that is unheard of.

3       Beyond the JSIN data, there is a host of relevant sentencing data available due to

4 the large number of cases that were brought as a result of the January Sixth Capitol

5 Breach cases.[30] The United States Attorney's Office for the District of Columbia

6 maintains a list of the cases brought, and more informative, the sentences imposed.[31]

7 Individuals who received sentences in the same general range as Mr. Anderson

8 committed exceptionally significant offenses. Not only did these individuals take the

9 serious step to physically enter the Capitol building during a violent protest, but while

10 inside, these individuals variously assaulted members of the media, destroyed property,

11 attempted to assault law enforcement officers, kicked down doors and engaged in

12 stand-offs with law enforcement.[32] One individual, who received a slightly higher

13 _____

14 [30] *Capitol Breach Cases*, USDOJ, https://www.justice.gov/usao-dc/capitol-breach-cases?combine=&order=changed&sort=desc (last updated Aug. 2, 2023).

[31] *Id*.

15 [32] See Exhibit 9; *see also, Capitol Breach Cases*, USDOJ, https://www.justice.gov/usao-dc/capitol-breach-cases?combine=&order=changed&sort=desc (last updated Aug. 2, 2023). George Tenney

16 was sentenced to 36 months' incarceration after he breached the Capitol and grappled with employees and law enforcement to get through doors inside. Exhibit 9 at 4-6. William Reid was

17 sentenced to 37 months' incarceration after participating in the attack on the Capitol, assisting others to climb up into the controlled area, and pushing through police lines to do so. *Id*. at 15-20.

18 Nicholas Ochs was sentenced to 48 months' incarceration after participating in the riot at the Capitol, entering the building, and throwing a smoke bomb (without pulling the pin) at law

19 enforcement officials. *Id*. at 25-28. Joshua Haynes was sentenced to 32 months' incarceration for his part in the attack on the Capitol and specifically because he destroyed government property and assaulted the media area where he destroyed thousands of dollars' worth of property. *Id*. at 33-

1    sentence than the government advocates for presently, actually threw a smoke bomb at

2    law enforcement officials, but failed to pull the pin before throwing it.[33]

3            Equally important, however, is the fact that individuals involved in the violent

4    insurrection on January Sixth *have been receiving probation sentences*.[34] Indeed, from a

5    review of the DOJ's website, it appears *over 200 people* have received sentences that

6    included some form of probation.[35] Defense counsel has selected two of the many,

7    many individuals who received probation sentences to highlight in this memorandum.

8    In both cases, the defendants received 60-month terms of probation—the same

9    sentence Mr. Anderson now asks the Court to impose. Mr. Matthew Council received

10   a 60-month probation term on December 12, 2022.[36] In the statement of the offense

11   submitted in conjunction with the plea agreement in his case, it details Mr. Council's

12   actions on January 6, 2021, and notes that as Mr. Council forced his way into the

13   building, he was sprayed with a chemical irritant by law enforcement, but nonetheless

14

---

15   36. Joshua Hughes was sentenced to 38 months' imprisonment for his role in the riot at the

16   Capitol where he was one of the first people to enter the building and after pushing through law
     enforcement to get inside, he chased law enforcement officers after entering the building and
     engaged in a stand-off with officers who were attempting to protect the Capitol. *Id.* at 41-43.

17   [33] Exhibit 9 at 25-28 (describing Nicholas Ochs's participation in the attack on the Capitol).

18   [34] *See generally*, *Capitol Breach Cases*, USDOJ, https://www.justice.gov/usao-dc/capitol-breach-
     cases?combine=&order=changed&sort=desc (last updated Aug. 2, 2023).

19   [35] *See generally*, *Capitol Breach Cases*, USDOJ, https://www.justice.gov/usao-dc/capitol-breach-
     cases?combine=&order=changed&sort=desc (last updated Aug. 2, 2023).

     [36] *Council, Matthew*, *Capitol Breach Cases*, USDOJ, https://www.justice.gov/usao-dc/capitol-
     breach-cases?combine=Council%2C+Matthew (last visited Aug. 2, 2023)

persisted.[37] Once inside, Mr. Council engaged with law enforcement and "[w]hen he reached the line of the USCP officers, [he] barged into them, attempting to push them back and make a hole so that other rioters could go through."[38] That is, Mr. Council actually, physically, engaged in violence against law enforcement during a violent insurrection. Yet despite this actual violence, a probation sentence was imposed.

Mr. Nicholas Rodean was also sentenced to a 60-month term of probation for his role in the January Sixth attack on the Capitol.[39] Mr. Rodean was found guilty after a bench trial of seven (7) total counts, to include engaging in physical violence in a restricted building and acts of violence in a Capitol building.[40] In sentencing Mr. Rodean, the court noted that it felt his autism spectrum diagnosis contributed to his actions that day, but noted that he did break two windows, climbed into the building without authorization, and that he *carried a hatched* into the Capitol with him.[41] The sentencing court did take special note that although the offense was serious, his "mental health challenges made him particularly susceptible to acting the way [he] did

---

[37] Exhibit 9 at 47-48.

[38] *Id*. at 48.

[39] *Rodean, Nicholas*, *Capitol Breach Cases*, USDOJ, https://www.justice.gov/usao-dc/capitol-breach-cases?combine=Rodean%2C+Nicholas (last visited Aug. 2, 2023).

[40] *U.S. v. Rodean*, No. 1:21-CR-00057-TNM, (D. D.C. 2022), ECF No. 77 (Sentencing Transcript), at p. 2-3.

[41] *Id*. at 47-48.

1    that day" and noted the impact the Covid pandemic had on individuals with mental

2    health struggles. [42]

3        Finally, within this very District, there is precedent for punishment in line with

4    Mr. Anderson's request. In *United States v. Kantola*, Mr. Kantola was charged with

5    felon in possession of explosives, and ultimately received a sentence of approximately

6    six (6) weeks custody (time served), followed by 3 years of supervised release.[43] Much

7    like Mr. Anderson's case, the government argued that Mr. Kantola had built a

8    destructive device out of commercial fireworks that could potentially cause death or

9    serious injury.[44] Unlike Mr. Anderson, however, Mr. Kantola had significant criminal

10   history, to include felony convictions.[45] Again, much like Mr. Anderson, Mr. Kantola

11   had been on pretrial release for approximately 18 months, had committed no violations,

12   and had maintained steady employment—the Court took note of these very factors in

13   deciding to impose no further custody.[46]

14       While none of these cases are an exact match for Mr. Anderson's situation, they

15   do shine significant light on the options available for this Court. Mr. Anderson does not

16   dispute the seriousness of the offense, that he discussed violence, and that he was

17   _____

18   [42] *Id*. at 48.
     [43] *United States v. Kantola*, 1:19-CR-02015-SAB (E.D. Wash. 2020), ECF No. 103 (Sentencing Minutes)

19   [44] *Id*. at ECF No. 96.
     [45] *Id*.
     [46] *Id*. at ECF No. 103.

heading down a treacherous path. But, unlike the individuals involved in the unprecedented and exceptionally serious riot at the Capitol on January Sixth, Mr. Anderson did not engage in physical violence against this country or law enforcement. He did not put his plan into action beyond constructing a single, rudimentary device— one that he did not even test for fear it could cause a fire. Rather, Mr. Anderson, struggling with mental health issues, found support from his fellow group members during a particularly unstable and uncertain time for this nation and its citizens. Mr. Anderson, feeling supported and appreciated, and seeking to nurture the admiration expressed for him, oversold his abilities and constructed the destructive device law enforcement located with his help. And while this was undoubtedly a poor decision from Mr. Anderson, that is where his conduct with this device ended. Both the JSIN and January Sixth sentencing information show that a probationary sentence here is reasonable and in keeping with defendants who are similarly situated to Mr. Anderson. And his conduct over the past 18 months show that he presents no danger to the community should he be placed on restrictive conditions of probation.

In conclusion, a 60-month term of probation provides sufficient deterrence, reflects the seriousness of the offense, and avoids any *unwarranted* sentencing disparities.

*The need to protect the public and to provide for rehabilitation in the most effective manner*

A five-year term of probation will ensure that the public is protected and will simultaneously ensure that Mr. Anderson gets the mental health support and treatment he needs. As part of the defense's preparation of this case, Mr. Anderson retained and was evaluated by Dr. Cedar O'Donnell.[47] Specifically, Dr. O'Donnell was retained to conduct a psychological evaluation and a dangerousness/risk assessment on Mr. Anderson. Dr. O'Donnell was retained partially because she has extensive history conducting dangerousness/risk assessments while working for various state departments of corrections.[48]

In preparation for her evaluation of Mr. Anderson, Dr. O'Donnell reviewed much of the extensive discovery in this case—over 50,000 pages of discovery and many hours of video and audio recordings.[49] During her evaluation of Mr. Anderson, Dr. O'Donnell utilized several risk assessment tools, to include: the Violence Risk Assessment Guide-Revised (VRAG-R), the Historical Clinical Risk-20 (HCR-20), the Terrorist Radicalization Assessment Protocol-18 (TRAP-18), and the Structured

---

[47] Exhibits 1 and 2 (Dr. O'Donnell's CV). Defense counsel intends on calling Dr. O'Donnell to testify at Mr. Anderson's sentencing. As such some discussion of her report will be reserved for the sentencing hearing.

[48] *See* Exhibit 2.

[49] *See* Exhibit 1 at 2-4.

1  Assessment of Protective Factors for Violence Risk (SAPROF).[50] Invariably, the

2  results of these assessments found Mr. Anderson to present a low risk for any future

3  violence or recidivism.[51]

4      Of particular interest to this case is the TRAP-18, which is used to assess the

5  "risk of terrorist violence across the entire spectrum of ideologically-motivated

6  individuals, whether jihadists, right-wing extremists, or single-issue perpetrators."[52]

7  This assessment looks at 18 different patterns of behavior. The more patterns present,

8  the higher the risk. Of the 18 patterns, only two (2) were present for Mr. Anderson—

9  (a) dependence on the virtual community and (b) thwarting of occupational goals.[53]

10  Critically, patterns that were absent for Mr. Anderson included: (a) directly

11  communicated threats, (b) mental disorder, (c) criminal violence, (d) novel aggression,

12  and (e) identification as a fighter or warrior.[54] This suggests that there is "no need for

13  more active management resources."[55]

14      In the same vein, the results of the VRAG-R found that Mr. Anderson presented

15  similarly to "a normative group sample that recidivated at a very low rate."[56] The

16

17  ─────────────────────
   [50] *Id.* at 14-19.
   [51] *Id.*

18  [52] *Id.* at 16.
   [53] *Id.* at 16-18.

19  [54] *Id.*
   [55] *Id.* at 18.
   [56] *Id.* at 14.

HCR-20 results indicated Mr. Anderson presented a low risk of future violence.[57] And the SAPROF, which is used in conjunction with the HCR-20, indicated "the presence (to some extent) of all 17 protective factors" which reduce the risk for future violence.[58] Dr. O'Donnell ultimately concluded that Mr. Anderson presented a minimal risk based on the assessment tools she used. Dr. O'Donnell wrote:

> There is no indication that Mr. Anderson poses any imminent risk for violence and it is my opinion that his risk for future violence is very low. Low risk means that he is not in need of any special intervention or supervision strategies designed to manage violence risk, nor is there a need to monitor him closely for changes in risk. Mr. Anderson does not represent a current or potential threat to public safety, the community, or any law enforcement agency.[59]

Indeed, Dr. O'Donnell's opinion has proven true over the past 18 months. Mr. Anderson's family, and support network—who uniformly discussed what a caring and supportive father and husband he is—have noted a sustained and admirable improvement in Mr. Anderson while on pretrial release.[60] His wife wrote to describe how he has taken a more active role in his community and has been involved in fund-raising activities with his motorcycle riding club.[61] She has seen how Mr. Anderson's life was previously ruled by paranoia and anxiety, but with his therapy and medication,

---

[57] *Id*. at 14-16.
[58] *Id*. at 18-19.
[59] *Id*. at 20.
[60] *See* Exhibits 2-4, 6-8.
[61] Exhibit 2.

he has regained control.[62] Mr. Anderson can once again go to the store and cook a meal, look after his children, and is much easier to get along with "now that he is not constantly riddled with his anxiety."[63]

Similarly, his friends describe how Mr. Anderson, now that he is once again receiving mental health support, goes out of his way to help others.[64] They describe Mr. Anderson as an important and valued member of their community who can be successful on probation.[65] His employer noted how Mr. Anderson took initiative, was a self-starter, and "excelled [in] learning his job quickly."[66] Even after resigning his position, Mr. Anderson went the extra mile of helping to train his replacement.[67]

In conjunction with resuming his role as a caring and responsible father and community member, Mr. Anderson was faced with the daunting task of complying with stringent conditions of pretrial release. Rather than stumble under the pressure, however, Mr. Anderson performed flawlessly. His conditions were modified to be less stringent over time and ultimately, Mr. Anderson was entrusted with using a cellphone without internet capabilities and he was removed from GPS-Monitoring.[68]

---

[62] *Id.*
[63] *Id.*
[64] Exhibits 6-8.
[65] *Id.*
[66] Exhibit 5.
[67] *Id.*
[68] *See* ECF Nos. 75, 91.

Over the course of those 18 months, Mr. Anderson proved day after day that his behavior leading to these charges was an aberration. That he is capable of steady and continued improvement while getting mental health treatment. That he is capable of being a caring father and maintaining employment. Mr. Anderson has stayed away from firearms, from trouble with the law, and has lived up to the high expectations this Court had for him on pretrial release. Mr. Anderson has shown that a probation sentence is sufficient to protect the community and ensure that he continues to get the mental health treatment he needs to be successful.

### III.    Conclusion

Mr. Anderson understands the serious nature of the charge he has pleaded guilty to and that he will be sentenced for. He has accepted responsibility for his actions and deeply regrets letting things get to where they did. In weakness, Mr. Anderson displayed poor decision-making and got swept up in the group's dynamic. But Mr. Anderson has spent the last 18 months demonstrating that he will not be defined by his actions at the lowest point in his life. He has shown that he understands and is capable of complying with serious supervision conditions. He has shown that he can get and hold a job and that he can thrive while getting the mental health support he needs. He has gotten back to being the loving father, husband, and son his family knew him to be. Respectfully, there is no ongoing danger posed by Mr. Anderson and a disservice will be done to Mr. Anderson's community if he is removed from it and incarcerated. For

Sentencing Memorandum
– 19 –

these reasons, and those described above, Mr. Anderson respectfully requests that the

Court accept his sentencing recommendation and impose a five-year term of probation.

Dated: August 2, 2023.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Daniel James Anderson

s/ Nick Mirr
Nick Mirr, AT0014467
Iowa State Bar Ass'n
306 E. Chestnut Ave.
Yakima, Washington 98901
t: (509) 248-8920
nick_mirr@fd.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

Service Certificate

I certify that on August 2, 2023, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF System, which will notify Assistant United

States Attorneys: Patrick J. Cashman.

<span style="margin-left:40%">s/ Nick Mirr</span>
Nick Mirr, AT0014467
Iowa State Bar Ass'n
306 E. Chestnut Ave.
Yakima, Washington 98901
t: (509) 248-8920
nick_mirr@fd.org